**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THOMAS LOBBE, EDWIN VEGA, ANTHONY
COLON, RUBEN DEJESUS, WILLIAM
GILBERT GARVIN, and DION PEMBERTON,
individually and on behalf of all others similarly
situated,

          Plaintiffs,

vs.

CABLEVISION SYSTEMS NEW YORK CITY
CORPORATION, CABLEVISION SYSTEMS
CORPORATION, CSC HOLDINGS, LLC,
ALTICE USA, and ALTICE TECHNICAL
SERVICES USA,

          Defendants.

Civil Action No. 1:16-cv-02207-AKH

**AMENDED CLASS AND**
**COLLECTIVE ACTION COMPLAINT**
**FOR DAMAGES, RESTITUTION AND**
**INJUNCTIVE RELIEF**

**JURY TRIAL DEMAND**

Plaintiffs, individually and on behalf of all others similarly situated, by their attorneys,

The Law Office of Christopher Q. Davis, PLLC, allege, upon personal knowledge and upon

information and belief as to other matters, as follows:

**NATURE OF ACTION**

1.      This is a collective and class action brought by Lead and Putative Class

Representative Plaintiffs Thomas Lobbe, Edwin Vega, Anthony Colon,  Ruben Dejesus, William

Gilbert Garvin, and Dion Pemberton (together, the "Representative Plaintiffs" or "Lead Plaintiffs")

and all Opt-in plaintiffs and putative plaintiffs (collectively, "Plaintiffs"), on their own behalf and

on behalf of the Collective Classes and proposed Rule 23 classes identified below.  Plaintiffs and

the Putative Class members and Collective Class members were or are employed by Defendants

Cablevision Systems New York City Corporation, Cablevision Systems Corporation, CSC

Holdings, LLC, Altice USA, Altice Technical Services,  (together "Altice-Cablevision" or "Defendants") as non-exempt hourly Field Service Technicians and were denied minimum wage compensation, "gap time" compensation, and overtime premium compensation by requiring Field Service Technicians to work "off-the-clock" during their unpaid half-hour meal breaks and failing to properly calculate their regular rate of pay.  Defendants also failed to provide Plaintiffs and the Putative Class with accurate wage statements in violation of New York Labor Law ("NYLL") §195(3).  The Putative Class and Collective Class of employees are similarly situated to the Plaintiffs under Federal Rule of Civil Procedure 23 and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b) and have suffered the same violations pursuant to Defendants' common policies and practices.

2.     The Collective Class is made of all persons who are or have been employed by Defendants as Field Service Technicians assigned to Defendants' facilities located in Brooklyn and the Bronx at any time within the three years prior to this action's filing date through the date of the final disposition of this action (the "Collective Class Period") and who were subject to Defendants' unlawful policy of failing to pay minimum wage compensation for all hours worked, failing to pay overtime premiums for all hours worked over 40 in a given workweek, and failing to keep accurate records of hours Plaintiffs' actually worked.

3.     The Class is made up of all persons who are or have been employed by Defendants as Field Service Technicians assigned to Defendants' Facilities located in Brooklyn and the Bronx within the period of six years prior to the filing date of the original March 24, 2016 Complaint (the "Class Period") and who were subject to Defendants' unlawful policy and/or practice of failing to pay Plaintiffs minimum wage, gap time compensation, and overtime premiums for all hours worked over 40 in a given workweek, and Defendants' unlawful practice

of failing to keep accurate records of hours Plaintiffs actually worked and failing to provide

Plaintiffs with accurate wage statements reflecting all hours, including overtime hours worked.

4.      Plaintiffs seek relief for the Class pursuant to the applicable provisions of the

NYLL and Collective Class under the FLSA, to remedy the Defendants' failure to pay all wages

due, in addition to injunctive relief.

## PARTIES

5.      Individual and Representative Plaintiff Thomas Lobbe is a former Field Service

Technician, and presently and at all relevant times residing in Bronx, New York.  He began his

employment with Defendants in 2004, in the Audit Department.  He has held the title of Field

Services Technician since 2011 and worked in the Bronx.  Plaintiff Lobbe has been on medical

disability leave since May 2015.

6.      Individual and Representative Plaintiff Edwin Vega is an Altice-Cablevision Field

Service Technician, presently and at all relevant times residing in Bronx, New York.  He began

his employment with Defendants in February 1999 and worked in the Bronx.

7.      Individual and Representative Plaintiff Anthony Colon is an Altice-Cablevision

Lead Field Service Technician, presently and at all relevant times residing in Bronx, New York.

He began his employment with Defendants in 2002 and worked in the Bronx through the present.

8.      Individual and Representative Plaintiff Ruben Dejesus is a former Altice-

Cablevision Field Service Technician and at all relevant times residing in Bronx, New York.  He

began his employment with Defendants in 2000 working in the Bronx, and held the title Field

Service Representative until February 2, 2012.

9.      Individual and Representative Plaintiff William Gilbert Garvin is presently employed

with Altice-Cablevision and at all times resided in Brooklyn, New York.  He began his

employment with Defendants in 2002, and held the title of Field Service Technician and Lead Field Service Technician in Brooklyn through the end of 2014 when he moved to a position in Outside Plant.  At all times he was employed in Brooklyn.

10.     Individual and Representative Plaintiff Dion Pemberton is presently employed with Altice-Cablevision and at all times resided in Brooklyn, New York.  He previously held the title of Field Service Technician in Brooklyn and he moved to a position in Outside Plant approximately 4 years ago.  At all times he was employed in Brooklyn.

11.     Defendants Cablevision Systems New York City Corporation, Cablevision Systems Corporation and CSC Holdings, LLC are Delaware corporations with principle places of business at 111 Stewart Avenue, Bethpage, New York.

12.     Lead Plaintiffs and the putative Class and Collective Class are presently employed by all Defendants as a single employer.

13.     Defendant Altice USA and Defendant Altice Technical Services USA, domestic subsidiaries of Netherlands based Altice N.V, are Delaware corporations unlicensed to conduct business in New York.  Altice N.V. acquired Cablevision Systems Corporation following a merger which was completed in June 2016 following the filing of Plaintiffs' original March 24, 2016 Complaint and operate in the US under their US subsidiaries: Altice USA and Altice Technical Services.

14.     Upon information and belief, Defendants were made aware of Plaintiffs' original March 24, 2016 Complaint pursuant to customary corporate merger due diligence and the requirements of regulatory compliance which Defendants were required to follow.  Even if Altice did not have actual notice, which Plaintiffs' do not concede, the exercise of due diligence provides constructive notice.

15.     Following the acquisition, as set forth below, Defendants have maintained a substantial continuity of business operations – Altice USA and/or Altice Technical Services utilize the same facilities in the Bronx and Brooklyn as Cablevison, uses substantially the same work force, substantially the same supervisory personnel, the same machinery, equipment, and methods of production and provides the same product/service.

16.     Following the acquisition, Defendants maintained an intentional unity of operations with respect to technical services provided to customers, including field services, and centralized control of labor relations, common management, and common ownership or financial control.

17.     Under the terms of the acquisition, Cablevision shareholders received $34.90 in cash for each Cablevision Class A and Class B common stock.  June 20, 2016, was the last full trading day of Cablevision Systems Corporation (NYSE: CVC) common shares on the New York Stock Exchange.

18.     Immediately following the acquisition, Altice merged its newly acquired Cablevision operations with its pre-existing Suddenlink and Optimium branded markets and operations, and retired the Cablevision name, and Altice USA was formed on June 21, 2016 from this the operational merger of these markets.

19.     The creation of Altice USA was "effective immediately" according to Altice press release which in it, named the Altice USA Executive Leadership Team.

20.     The Altice USA Executive Leadership Team includes Dexter Goei, named Chairman and Executive Officer of Altice USA, who is also the President of Altice N.V.

21.     The Altice USA Executive Leadership Team also includes Hakim Boubazine, Co-President and Chief Operating Officer of Altice USA, who is also on the Altice Technical Services Transition Team.

22.     The Lead Plaintiffs and the putative Class and Collective Class have been informed that they are affiliated with Altice USA by Altice USA corporate representatives, and they recently received information regarding such.

23.     Lead Plaintiffs and the putative Class and Collective Class health and other insurance benefits and 401K plans were transferred over to Altice USA in the month of December 2016.

24.     In the month of December 2016, Lead Plaintiffs Ruben DeJesus and Edwin Vega received notice from Altice USA that administration of their health insurance plans, 401K plan and other benefits was being transferred to Altice USA.

25.     Altice Technical Services (ATS) was formed as a subsidiary of Altice USA and will house all US-based field service, construction & fiber, design, outside plant maintenance, inside plant and field-based employees serving commercial accounts.

26.     Altice USA executives have made public statements indicating that ATS will begin migrating Altice-Cablevision Field Service Technicians who opt to join ATS between January and April 2017 with an offer of cash incentives. Altice-Cablevision Field Service Technicians who make the switch will retain the same Altice USA health and welfare benefits, seniority and vacation time once they switch to ATS.

27.     In December 2016, a video presentation was made to all Altice-Cablevision Field Service Technicians regarding the transition offers to ATS in January 2017 by Hakim Boubazine, Co-President and Chief Operating Officer of Altice USA and other presenters.

28.     In the presentation, the narrating presenter explained that offers would be made to Altice-Cablevision Field Service employees to transition to ATS, but that ATS remained affiliated with Altice USA and that, should an employee transition to ATS, benefits would still be provided by Altice USA following the transition, and that seniority from Altice-Cablevision employment would be recognized.

29.     The presenter further explained that if an employee decided not to transition from ATS, they would remain an Altice USA employee.

30.     In the video presentation, it was announced that Barry Monopoli would be the head of operations for the new ATS organization.  Mr. Monopoli was previously the Regional Vice President of the New York City Market under the legacy Cablevision operation immediately prior to the merger, and formerly the business operations at the Brooklyn and Bronx Facilities while the Lead Plaintiffs and the putative Collective Class and Class Members were employed during the Class Period.

31.     As announced in the video, many of the former managers employed under the the legacy Cablevision operation immediately prior to the merger, who previously had managerial or supervisory authority over the putative Collective Class and Class Members during the Class Period, are now or will be, employed by ATS.  This essentially ensures continuity of operation in the Bronx and Brooklyn among legacy Cablevision field service managers and technicians.

32.     In December 2016, Lead Plaintiff Edwin Vega and all other members of the putative Collective Class and Class still employed by Altice-Cablevision received notice that they may join ATS in January 2017.

33.     Upon information and belief, some members of the putative Collective Class and Class have already elected to join ATS in January 2017.

34.     At all relevant times, all the Altice-Cablevision Defendants have met the definition of Plaintiffs' "employer" under Section 3(d) of the FLSA, 29 U.S.C. § 203(d) and NYLL §190(3).

35.     Upon information and belief, Defendants maintain control, oversight, and direction over their operations and employment practices, including commonly managed human resources, benefits, and labor functions.

36.     The Defendants have operated together as a single common enterprise in conducting business, including the business practices described in this Amended Complaint.  The Defendants are interrelated companies that have common ownership, officers, managers, product, and corporate purpose.

37.     At all times hereinafter mentioned, Defendants employed employees, including Plaintiffs, who regularly engaged in commerce or in the production of goods for commerce or in handling, selling or otherwise working on goods and materials have moved in or produced for commerce within the meaning of Section 3(b), (g), (i) and (j) of the FLSA, 29 U.S.C. § 203(b), (g), (i), (j), (r) &(s).

38.     Defendants' gross volume of business is not less than $500,000 within the meaning of 29 U.S.C. § 203(s)(A)(ii).

## JURISDICTION & VENUE

39.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  The Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332.

40.     In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 207 et seq.

41.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

42.     Venue is proper in the United States District Court, Southern District of New York pursuant to 28 U.S.C. § 1391, because the wage violations which give rise to Plaintiffs' claims occurred in this District.

43.     This Court has personal jurisdiction over Defendants because they reside in and routinely transact business in New York.

### WAGE AND HOUR COLLECTIVE CLASS AND CLASS ACTION FACTUAL ALLEGATIONS

44.     Altice-Cablevision is a telecommunications service provider with operations in the New York metropolitan area.

45.     Altice-Cablevision provides residential cable services to over 3 million subscribers residing in New York, New Jersey, Connecticut and parts of Pennsylvania.

46.     Altice-Cablevision utilizes both in-house and contractor technicians to provide in-home technical support for their cable subscribers, including installation and troubleshooting support.  Altice-Cablevision's contractor technicians have been the subject of numerous prior wage and hour collective and class action lawsuits alleging similar violations as those alleged herein.[1]

47.     Defendants have facilities in the Bronx, New York and Brooklyn, New York, through which Altice-Cablevision provides customer service support to residential subscribers in the Bronx, Brooklyn and other locations in the New York Metropolitan area.  Altice-Cablevision

---

[1] The Lead Plaintiffs are, and were at all times, employees of Defendants and not independent contractors. The proposed and putative FLSA collective class and Rule 23 classes do not include Defendants' independent contractor workforce.

9

also has facilities in Long Island, New York, Westchester County, New York, Connecticut and New Jersey.

48.     Altice-Cablevision collectively refers to these New York Metropolitan area facilities as the "footprint," which also includes other affiliated businesses that do not include cable facilities, for example Newsday, News 12 and Lightpath.  Altice-Cablevision employs over 17,000 employees at its various facilities throughout the footprint.

49.     Upon information and belief, there are three Altice-Cablevision support facilities, or depos, in Brooklyn: (i.) 45th Street and Avenue H (45th Street facility); (ii.) East 92nd Street and Avenue D (92nd Street facility); and (iii.) East 96th Street and Avenue D (96th Street facility), and one facility located in the Bronx, located on Brush Avenue (collectively referred to as the "Brooklyn and Bronx Facilities").

50.     Field Service Technicians assigned to the Bronx and Brooklyn facilities are required to abide by the terms and conditions of Altice-Cablevision's Employee Handbook, which is applicable to all employees throughout the footprint.

51.     The Brooklyn and Bronx Facilities service a significantly higher volume of customers than their counterparts in suburban New York, New Jersey and Connecticut.

52.     Barry Monopoli, Altice-Cablevision Regional Vice President of the New York City Market, formerly the business operations at the Brooklyn and Bronx Facilities.  Upon information and belief, Mr. Monopoli, as a regular practice, visits the Brooklyn and Bronx Facilities on a regular weekly basis.

53.     Following the merger, upon information and belief, Mr. Monopoli retained employment and continued to share responsibilities between Altice USA and Altice-Cablevision.

54.     As mentioned above, Mr. Monopoli was recently appointed as the managing head of Altice Technical Services and, upon information and belief, as of December 2016, his position has transitioned to Altice Technical Services where he will also remain affiliated with Altice USA for the sake of managing those who do not transition to ATS.

55.     In this position, he will be responsible for all Field Service Operations in Brooklyn and the Bronx under both Altice Technical Services and Altice-Cablevision, and will essentially continue in the same functional role he is in now.

56.     Richard Burns, Altice-Cablevision Director of Operations, reports directly to Mr. Monopoli, and shares operational responsibility over the Bronx and Brooklyn Facilities.  Upon information and belief, Mr. Burns supervises at least six managers, including four Field Service Managers at the Bronx Facility, who in turn oversee twelve to sixteen Field Service Supervisors.

57.     Burns and Monopoli oversee and enforce all operational polices and practices which relate to the services provided by Field Service Technicians in the Brooklyn and Bronx facilities.

58.     Upon information and belief, Defendants directly employ hundreds of in-house technicians, in the Brooklyn and Bronx Facilities, including Field Service Technicians, who provide installation and troubleshooting service to Altice-Cablevision customers.  Field Service Technicians are organized into teams of approximately ten to fifteen technicians, with each team reporting to its own Field Service Supervisor.  Each team is also assigned at least one Lead Field Service Technician, who holds all the same job duties as Field Service Technicians, but may be assigned additional responsibilities including monitoring the other technicians on the team and assignment to more difficult jobs that subordinate technicians do not have the expertise to complete.

**Defendants' Unlawful "Off the Clock" Practice of Forcing Plaintiffs to Work During Unpaid Lunch Breaks**

59.     In order to provide Altice-Cablevision customers with adequate service, Defendants require non-exempt hourly Field Service Technicians to meet demanding productivity requirements each workday, forcing Plaintiffs to work in excess of 40 hours per week in order to avoid disciplinary action.  As a result, Plaintiffs regularly worked "off-the-clock" through their unpaid half-hour meal breaks.

60.     Field Service Technicians are assigned to weekly shifts that consist of 5 consecutive 8.5-hour days, or 42.5 hours a week, with a half-hour meal period automatically deducted from each daily shift.  According to the Altice-Cablevision Employee Handbook, Field Service Technicians may also perform overtime-eligible labor that is pre-approved and scheduled in advance by a supervisor or manager, and are paid at one and one-half their hourly rate of pay for this time.[2]

61.     According to the Altice-Cablevision Employee Handbook, "incidental overtime" (i.e. approved but unscheduled overtime-eligible labor) may be needed to "ensure a high degree of service to our customers and guests, to address business needs, breaking news or unplanned events."  Field Service Technicians are paid one and one-half their hourly rate of pay for this pre-approved overtime.

---

[2]     Additionally, Field Service Technicians may be eligible for "standby" scheduling, whereby "employees are scheduled to be available to perform work outside their regular work schedule, as required by their supervisor/ manager to meet the Company's business needs."  While on standby, employees receive a lump sum incentive pay of approximately $100 to $200, in addition to their hourly rate of pay for hours worked, or their overtime rate of pay for all standby hours worked over forty hours in a given work week.

62.     According to the Altice-Cablevision Employee Handbook, supervisors must approve overtime labor in advance and "failure to obtain advance approval may result in corrective action, up to and including suspension or termination of employment."  Further, according to the Handbook, "[i]t is Altice-Cablevision's policy that employees be paid for all overtime worked and [employees] must report all overtime hours worked, even if [they] did not receive advance approval."

63.     According to Altice-Cablevision's commonly enforceable policies and practice, working unapproved "incidental overtime" hours, while compensable, is prohibited.

64.     Pursuant to Altice-Cablevision's common policies, Field Service Technicians are required to report to their assigned facility before the start of their shift in order to receive their daily route assignment, which includes between 4 and 6 different jobs, each assigned a particular time slot.  Plaintiffs must arrive at their assigned jobs during the designated time slot or they will be penalized for lateness.

65.     During the early years of the Class period, Field Service Technicians received their daily assignments on a printout "work order" provided by their supervisors.  More recently, Plaintiffs were provided with electronic tablet devices, equipped with ETA Direct and/or Tech Mobility performance tracking software ("Altice-Cablevision Software"), through which Field Service Technicians receive their daily route assignments.  Field Service Technicians are required to use the Altice-Cablevision Software to access their assigned jobs, daily schedule, and other information necessary to perform their jobs.  Further, Field Service Technicians are required to indicate in Altice-Cablevision Software when they start and finish each job.  Prior to the implementation of the Altice-Cablevision Software, Field Service Technicians were similarly

required to provide similar start and finish times for each job; however it was done so on the printout "work orders" and/or "Field Service Daily Logs".

66.     According to Altice-Cablevision policy and practice, optimizing Field Service Technician's efficiency and customer service deliverables through regular performance monitoring, including monitoring data entered by the Field Service Technicians in the Altice-Cablevision Software, is a critical managerial responsibility. Notably, at particular times throughout the Class and Collective Action Class Periods, Altice-Cablevision has offered customers a promotional $20 discount when Field Service Technicians arrived late to the job.

67.     Consistent with Altice-Cablevision's policy of prioritizing timely arrivals of their Field Service Technicians, "lateness" is a critical component of Plaintiffs' performance evaluation.  Field Service Technicians who arrive late to a certain predetermined number of customer appointments will receive a poor performance ranking, which adversely impacts a Field Service Technician's eligibility for promotions and hourly wage increases.  Plaintiffs report that Field Service Technicians work in constant fear that they will be disciplined for lateness.

68.     Plaintiffs also are under intense pressure to complete all assigned jobs within their 8.5-hour shift, so as to avoid "incidental overtime."  They speak with their supervisors by phone throughout the day and are pressured to avoid working after their scheduled shift ends.  They also receive regular reminders from supervisors and managers that incidental overtime will only be approved in certain circumstances.  According to Altice-Cablevision's common performance evaluation system, Field Service Technicians are evaluated and potentially penalized for working incidental overtime in their annual performance review.

69.     As such, Field Service Technicians are required to strictly adhere to their assigned schedule.  Once the shift begins, they are allotted approximately twenty-five minutes to review

their daily assignments, load the supplies they will need for the day onto their Altice-Cablevision

vehicle, and depart from their facility to begin the drive to their first assignment.  Given the high

volume of Technicians in the depot completing these tasks during the beginning of each shift,

together with the fact that Field Service Technicians were often required to attend team meetings

with their supervisor before heading out into the field, Plaintiffs were typically unable to depart

from the depot within the time allotted for doing so (25 minutes), meaning they often started

their assigned route already behind schedule.

70.     Because the actual time required to properly complete a job is often longer than

the time allotted in Field Service Technician's assigned schedule (which often includes jobs with

start windows before their shift even begins), and given delays associated with leaving the depot,

traffic and other natural setbacks, Plaintiffs are typically behind schedule by early afternoon.

71.     In order to stay as close to schedule as possible, complete each assigned job

within the allocated time frame, finish all assigned jobs within the 8.5 hour shift and avoid

discipline for lateness, Plaintiffs are forced to work through their thirty-minute unpaid lunch

break on an almost daily basis.  Rather than take the thirty-minute break, Plaintiffs often eat

lunch on the go as they drive between jobs or skip lunch entirely.

72.     Meanwhile, Plaintiffs receive calls from Altice-Cablevision dispatchers and

supervisors throughout the day, pressuring them to complete their jobs quickly and asking them

when they will arrive at the next assigned job.  To that end, even when Plaintiffs would try to

take their lunch breaks, they would often receive calls from their supervisors, requesting that

Plaintiffs pick up extra jobs or pushing them to get to their next job as soon as possible.

73.     Supervisors and Altice-Cablevision dispatchers have access to Field Service

Technicians' individual Altice-Cablevision Software platform and can monitor their productivity

throughout the day by tracking their location, timeliness to each job, length of time to complete each job and determine which jobs may be likely to begin behind schedule.

74.     The Altice-Cablevision Software provides for a lunch break in each Field Service Technician's daily schedule and Plaintiffs are expected to electronically activate the lunch break, and indicate that they took the thirty-minute break.  However, given the intense demands to complete jobs in a tight schedule, Plaintiffs often, among other things, (i) cancel lunch, quickly activate and deactivate the lunch to "clear" the lunch from their schedule and continue to the next assigned job, (ii) activate the lunch at the end of the day on their drive back to the depot, (iii) activate the lunch on their drive to their next assigned job; (iv) activate the lunch, get interrupted, and forget to deactivate showing an overly long lunch; (v) show a lunch but then include "no lunch", "BS" (standing for "bull shit"), or other comments in the "comments" field on the Altice-Cablevision Software or on the Field Service Daily Logs/workorders.

75.     While this software tracks Technicians' schedules on a daily basis, Plaintiffs are not paid based on their time logged in the platform.  Rather, according to Altice-Cablevision policy applicable to the entire class and collective class before and after Altice-Cablevision implemented this software, Defendants have tracked Field Service Technician's working time via paper sign in/out time logs.

76.     At the end of every shift, Plaintiffs are required to manually record their start and end time, on a weekly time log sheet maintained by their supervisor.  Each time sheet has a row for each Field Service Technician assigned to the supervisor's team, as well as a column for each day of the week.  The time logs do not have a space for Plaintiffs to record when they started and stopped their lunch break or that they worked through a lunch break, nor did Defendants require Field Service Technicians to record this information.  Still, on days when they worked through

their lunch, Plaintiffs would frequently write "no lunch" on the log sheet, indicating to their Supervisor that they had not taken lunch that day.  Regardless of writing in "no lunch" on the log sheet, most class members were nonetheless not compensated for such time. Since writing in "no lunch" made no difference, some class members stopped doing so.

77.     Plaintiffs' supervisors were responsible for inputting each Field Service Technician's time into Altice-Cablevision's payroll system.  Throughout the entire Class and Collective Class Periods, the payroll system has automatically deducted a thirty-minute meal break from each day worked, regardless of whether the employee actually took the meal break. To that end, on days when Plaintiffs worked through their lunch break with the awareness of supervisors or managers, such as when they wrote "no lunch" on the time log sheets, or recorded "no lunch" through Altice-Cablevision Software, the automatic thirty-minute meal break was nonetheless deducted from their time and they were not paid for it.

78.     Defendants, pursuant to commonly enforced policies and practices, failed to provide Plaintiffs with any means or method, let alone any procedure, for recording actual hours worked during unpaid lunch breaks.  This conflicts with Altice-Cablevision's own mandate that employees must record all hours worked, and violates the NYLL and FLSA, which require employers to maintain accurate payroll records.  Indeed, even when Plaintiffs attempted to record a missed lunch on time sheets and Altice-Cablevision Software, or made verbal reports to their supervisors that they worked through lunch, they were not paid for this time worked despite the awareness of Altice-Cablevision's management, in violation of the FLSA and Defendants' own policy that "employees be paid for all overtime worked."

79.     As a result of Defendants failure to maintain accurate payroll records that reflect that actual amount of time that Plaintiffs worked, Defendants failed to furnish Plaintiffs and

members of the Class with accurate and/or complete wage statements on each payday, that

included the total hours worked each week and the full amount of wages earned during the pay

period.

**Defendants Have Knowledge Of The Widespread "Off-The-Clock" Practices in the
Brooklyn and Bronx Facilities**

80.      Defendants' knowledge of the pervasive and widespread nature of the off-the-

clock violations alleged herein is well documented, and implicates all levels of management,

from supervisors all the way up to the Director of Human Resources and James Dolan, the

company's Chief Executive Officer, in willful violations of the labor laws.

81.      Plaintiffs frequently reported through Altice-Cablevision Software and time log

sheets, both of which are monitored by Plaintiffs' supervisors, that they were forced to work

through their unpaid lunch without compensation.  Additionally, the Representative Plaintiffs

complained about working through lunch to their supervisors on numerous occasions throughout

the Class and Collective Class Time Period.

82.      Meanwhile, Field Service Technicians' collective frustration with working

through their unpaid lunch on an almost daily basis was well known by Altice-Cablevision

management in the Brooklyn and Bronx Facilities.   Indeed, working though lunch was a

common subject of team meetings attended by Field Service Technicians and their supervisors.

83.      For instance, as early as January 27, 2012, an email was sent by Michael

Williams, Director of HFC Operations, to two other managers at the Bronx Facility with

management responsibilities over the NYC footprint in Brooklyn and the Bronx, Director of

Fiber Network Ponch Gordills, and Vice President of Infrastructure for the Greater New York

Area Peter Odell, stating, "Field Operations Technicians were very vocal and complaining about

salary increases, routes, not having enough time to complete their tasks, and *working through lunch*." (emphasis added).

84.     When supervisors failed to remedy Defendants' rampant off-the-clock practices, Plaintiff Lobbe escalated the issue to Altice-Cablevision's Human Resource Department, meeting with Human Resource personnel three times between June 2013 and April 2014 to complain about Field Service Technicians regularly working through lunch and obtain payment for this unpaid work.  His complaints fell on deaf ears, as the off-the-clock practices in the Brooklyn and Bronx Facilities continued with regularity.  Again, Defendants' actual practice violated its own policy, which encourages employees who "have not been paid the proper amount of overtime that [they] have worked, [to] contact [their] supervisor/manager or Human Resources representative."

85.     Frustrated with Human Resource's failure to address Altice-Cablevision's illegal payroll practices, Plaintiff Lobbe emailed James Dolan, Chief Executive Officer and former owner of Altice-Cablevision, on or about April 8, 2014, informing him of Defendants' failure to compensate Plaintiffs for the off-the-clock work they performed during lunch.  Specifically, Plaintiff Lobbe wrote:

> am writing this email on my behalf in regards to unpaid wages stemming back to the year 2010 - to date.  For years Altice-Cablevision field service employees have been working through their 30 minute lunch break to accommodate Altice-Cablevision customers and the technicians daily work load.  Your employees have made management and Human Resources aware of these (unlawful) practices in town meetings.  I personally have had multiple meetings with Human Resources and management prior, during, and as of recent to the deployment, of ETA Direct.  Since June 29, 2013 I have had three meetings with current management and Human Resources.  I have exhausted all the appropriate channels provided by Altice-Cablevision.  I would appreciate your attention pertaining to this matter, for it has become critical.

86.     Plaintiff Lobbe did not receive a direct response from Mr. Dolan or Sandy Kapell, whom he cc'd on the email.  Instead, he received formal correspondence from Hector Reyes, Direct of Human Resources, dated April 30, 2014, which stated:

> It has recently come to Altice-Cablevision's attention that you claim that the Company's time records do not accurately reflect the hours you worked during certain weeks because you worked through your assigned lunch period and that you believe you are owed additional compensation for those hours.  Altice-Cablevision has looked into your claims, which included a review of your work orders dating back to 2010 and a review of data from the ETA Direct System.  The review substantiated that you noted that you worked through thirty lunch periods without corresponding payment.

87.     Notably, this correspondence alleges that Plaintiff Lobbe did not follow the proper process for recording time worked through lunch, however, Lobbe reported this problem to his supervisors over the course of several years without remedy.  Further, Altice-Cablevision's own HR Department's only means of cobbling together any record of Plaintiff's Lobbe's unpaid worked lunches was by making resort to unofficial records of his hours.  In fact, Lobbe was never informed of any proper method for recording hours worked through his lunch, and training modules for new time sheet software in use at the time *explicitly* required nonexempt employees to punch out and register a lunch periods, Plaintiffs, however, were never given access to this automated time keeping system.[3]  This clearly demonstrates that Defendants did not, in fact, have any process for recording time worked through lunch.

88.     Despite Altice-Cablevision's admissions that Plaintiffs frequently worked off-the-clock through their lunch breaks, going so far as to accept liability for Plaintiff Lobbe's lost overtime wages which were the result of working unpaid lunches on multiple occasions over the course of four years, a large volume of often-repeated verbal complaints from Field Service

---

[3] According to the training module, non-exempt Altice-Cablevision employees were instructed "Note: In most cases the system will automatically deduct your scheduled lunch break.  If not, you **must** also enter your **In** and **Out** times for your lunch break."  [original emphasis].

Technicians to supervisors and management throughout the Bronx and, upon information and belief, Brooklyn regarding the same unlawful practice, and voluminous written records documenting the fact that Field Service Technicians were working through lunches without pay, Defendants knowingly failed to correct their illegal over time policies, and off-the-clock violations continue to this day.

**Defendants' Unlawful Calculation of Plaintiffs' Regular Rate of Pay in Determining Overtime Premiums**

89.     Plaintiffs and all members of the Collective and Proposed Classes were eligible for and received annual bonuses paid by Defendants.

90.     All Altice-Cablevision Field Service Technicians in the Brooklyn and Bronx Facilities were eligible for this bonus.

91.     The bonuses were computed based on a predetermined and nondiscretionary formula that was dependent on the success of the facility as a whole.

92.     The bonuses were thus awarded based on the success of the Defendant's employees as a group and not based on any particular Plaintiffs' personal productivity.

93.     The annual bonuses were awarded to employees to induce them to work more steadily, rapidly, and efficiently and are thus required to be included within the regular rate of pay under the FLSA and the NYLL.  Despite this, they were not included within the regular rate of pay for the purposes of calculating overtime wages at any point during the class and collective class periods.

## FLSA COLLECTIVE ACTION ALLEGATIONS

94.     Plaintiffs incorporate by reference all of the factual allegations made in the preceding paragraphs.

95.     Defendants employed Plaintiffs during the Collective Class Period.

96.     Defendants classified Plaintiffs and Members of the Collective Class as nonexempt for the purposes of the FLSA, paying them an hourly wage rather than an annual salary.

97.     Upon information and belief, there are approximately more than 400 current and former Field Service Technicians who are similarly situated to Plaintiffs and who were denied overtime compensation.

98.     The Lead Plaintiffs represent other Field Service Technicians, and are acting on behalf of Defendants' current and former Field Service Technicians' interests as well as their own interests in bringing this action.

99.     Defendants unlawfully required Plaintiffs and all individuals employed as Field Services Technicians to work through their unpaid half-hour meal breaks.

100.    At all times during the Collective Class Period, Defendants, as a matter of common policy and/or practice, have not paid Plaintiffs lawful overtime premiums for all hours worked in excess of 40 hours in a work week and/or minimum wage compensation for hours worked under 40 in a work week.

101.    Plaintiffs seek to proceed as a collective action, pursuant to 29 U.S.C. §216(b), on behalf of themselves and the following class of persons:

**Collective Class:**     All individuals employed by Defendants as Field Service Technicians, or similar titles, including Lead Field Service Technicians, in Defendants' Brooklyn, New York and Bronx, New York facilities at any point during the Collective Class Period who earned but were not paid lawful FLSA overtime premiums for hours worked over 40 in a work week and/or the applicable federal statutory minimum wage for hours worked under 40 in a workweek during the Collective Class Period based on the practices alleged herein.

102.    Specifically, Plaintiffs' Collective Class is further defined as involving (i) claims for unpaid overtime based on Defendants' company-wide policy of miscalculating the "regular rate of pay" for the purposes of determining overtime pay entitlement; and (ii) claims for unpaid overtime and minimum wage compensation for Defendants' practice of forcing Plaintiffs to work "off the clock" and without compensation during unpaid meal breaks which they knowingly suffered and permitted, and/or commonly enforced FLSA recordkeeping practice violations which resulted in unpaid wages.

103.    As such, the Named Plaintiffs and the Collective Class suffered damages for unpaid earned overtime wages under the FLSA in each of the weeks they worked during the Collective Class Period.

104.    Defendants were aware or should have been aware that the law required it to pay non-exempt employees, including Plaintiffs and the Collective Class, an overtime premium of 1 and ½ times their regular rate of pay for all work-hours Defendants suffered or permitted them to work in excess of 40 per workweek.

105.    Defendants' conduct, as set forth in this Amended Complaint, was willful and in bad faith, and has caused significant damages to Plaintiffs and the Collective Class.

106.    Defendants are liable under the FLSA for failing to properly compensate Plaintiffs and the Collective Class, and as such, notice should be sent to the Collective Class.

107.    There are numerous similarly situated current and former employees of Defendants who were subject to the aforementioned policies in violation of the FLSA who would benefit from the issuance of a Court supervised notice of the present lawsuit and the opportunity to join in the present lawsuit.

108.    Those similarly situated employees are known to the Defendants and are readily

identifiable through Defendants' records.

**FEDERAL RULE OF CIVIL PROCEDURE**
**RULE 23 NEW YORK CLASS ALLEGATIONS**

109.    Plaintiffs incorporate by reference all of the factual allegations made in the

preceding paragraphs.

110.    Plaintiffs seek to proceed as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of the following defined classes:

**Proposed Class:**    All individuals employed by Defendants as Field Service
Technicians, or similar titles, including Lead Field Service
Technicians, in Defendants' Brooklyn, New York and Bronx, New
York facilities at any point during the Class Period who earned but
were not paid lawful NYLL overtime premiums for hours worked
over 40 in a work week and/or the New York minimum wage for
hours worked under 40 in a workweek during the Collective Class
Period based on the practices alleged herein.

111.    Specifically, Plaintiffs' Class is further defined as involving: (i) claims for unpaid

overtime based on Defendants' company-wide policy of miscalculating the "regular rate of pay"

for the purposes of determining overtime pay entitlement; (ii) claims for unpaid overtime and

minimum wage compensation for Defendant Altice-Cablevision's practice of forcing Plaintiffs to

work "off the clock" and without compensation during unpaid meal breaks which they

knowingly suffered and permitted, and/or commonly enforced FLSA recordkeeping practice

violations which resulted in unpaid wages; and (iii) claims for wage statement violations for

Defendants' failure to provide Plaintiffs' with accurate wage statements on each payday that

include the information required by NYLL §195(3), including the correct  number of hours

worked during the pay period.

112.    Defendants have violated NYCRR 142-2.2 and NYLL §§ 191, 193 by failing to pay Plaintiffs and the putative class at least one and one-half times the New York state minimum wage for all hours worked over 40 during the class period pursuant to the same illegal practices and policies alleged above.

113.    Numerosity:    The Proposed Class is so numerous that joinder of all members is impracticable.  Plaintiffs are informed and believe, and on that basis allege, that during the Class Period, Defendants employed over 400 people who satisfy the definition of the Proposed Class.

114.    Typicality:    Plaintiffs' claims are typical of those of the Proposed Class.  The Representative Plaintiffs are informed and believe that, like other Field Service Technicians,  the Class members were subjected to Defendants' policies, practices, programs, procedures, protocols and plans alleged herein concerning the failure to pay proper wages, failure to keep adequate records and failure to furnish accurate wage statements.

115.    Superiority:    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

116.    Adequacy:    The Representative Plaintiffs will fairly and adequately protect the interests of the Proposed Class, and have retained counsel experienced in complex FLSA and NYLL class and collective action litigation.

117.    Commonality:  Common questions of law and fact exist to all members of the Proposed Class and predominate over any questions solely affecting individual members of the Proposed Class, including but not limited to:

a.    Whether Defendants unlawfully failed to pay lawful overtime premiums for all hours worked over 40 in a workweek for those violations stated above;

b.     Whether those violations were pursuant to a common policy or practice applicable to all class members;

c.     Whether Defendants unlawfully failed to pay the state statutory minimum wage to members of the Proposed Class in violation of the NYLL;

d.     Whether Defendants furnished class members with accurate wage statements on each payday containing the information required by NYLL § 195(3);

e.     Whether Defendants kept and maintained records with respect to each hour worked by Plaintiffs and the Proposed Class;

f.     Whether those violations were pursuant to a common policy or practice applicable to all class members;

g.     Whether Defendants employed Plaintiffs and the Proposed Class within the meaning of New York law;

h.     The proper measure of damages sustained by the Proposed Class; and

i.     Whether Defendants' actions were "willful."

118.    The case is maintainable as a class action under Fed. R. Civ. P. 23(b)(1) because prosecution of actions by or against individual members of the class would result in inconsistent or varying adjudications and create the risk of incompatible standards of conduct for Defendants. Further, adjudication of each individual member's claim as a separate action would be dispositive of the interest of other individuals not party to this action, impeding their ability to protect their interests.

119.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Proposed Class predominate over any questions affecting only individual members of the Proposed Class, and because a class action is superior

to other available methods for the fair and efficient adjudication of this litigation.  Defendants'

common and uniform policies and practices denied the Proposed Class the wages to which they

are entitled.  The damages suffered by the individual Proposed Class members are small

compared to the expense and burden of individual prosecution of this litigation.  In addition,

class certification is superior because it will obviate the need for unduly duplicative litigation

that might result in inconsistent judgments about Defendants' practices.

120.    Plaintiffs intend to send notice to all members of the Proposed Class to the extent

required by Rule 23.  The names and addresses of the Proposed Class are available from

Defendants.

121.    During the class period, and upon information and belief, Plaintiffs each worked

more than 1 hour of gap time for which they were not paid the lawful minimum wage under

either the NYLL or the FLSA and more than 1 hour of overtime-eligible work during the class

and collective class periods for which they were not paid a lawful overtime premium of time and

one half of their regular rate of pay.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Unlawful Failure to Pay Overtime Compensation under the Fair Labor Standards Act)**

122.    Plaintiffs allege and incorporate by reference the allegations in the preceding

paragraphs.

123.    Plaintiffs consent in writing to be a part of this action, pursuant to 20 U.S.C. §

216(b).  Plaintiffs written consent forms are attached hereto.  Plaintiffs anticipate that as this case

proceeds, other individuals will sign consent forms and join as plaintiffs.

124.    At all relevant times, Defendants have been an "employer" engaged in interstate

commerce and/or in the production of goods for commerce, within the meaning of the FLSA, 20

U.S.C. § 203.  At all relevant times, Defendants have employed and continue to employ

employees, including Plaintiffs, and the Collective Class members.  At all relevant times, upon information and belief, Defendants have gross operating revenues in excess of $500,000.00.

125.    The FLSA requires each covered employer to compensate all non-exempt employees at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours per work week.

126.    During their employment with Defendants, within the applicable statute of limitations, Plaintiffs and the other Collective Class members worked in excess of forty hours per workweek without lawful overtime compensation.

127.    Despite the hours worked by Plaintiffs and the Collective Class members, Defendants willfully, in bad faith, and in knowing violation of the Federal Fair Labor Standards Act, failed and refused to pay them overtime compensation.

128.    Plaintiffs were not paid FLSA mandated overtime premiums uniformly and based on the policies and practices articulated above.

129.    Also, by failing to accurately record, report, and/or preserve records of hours worked by Plaintiffs and the Collective Class, Defendants have failed to make, keep, and preserve records with respect to each of their employees sufficient to determine their wages, hours, and other conditions and practices of employment, in violation of the FLSA, 20 U.S.C. § 201, et seq.

130.    Defendants have failed to make a good faith effort to comply with the FLSA with respect to its compensation to Plaintiffs and the Collective Class.

131.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA, within the meaning of 29 U.S.C §§ 216(b) and 255(a).

132.    Because Defendants' violations of the FLSA were willful, a 3-year statue of limitation applies, pursuant to 29 U.S.C. § 255.

133.    Plaintiffs, on behalf of themselves and the Collective Class, seek recovery of their attorneys' fees and costs to be paid by Defendants, as provided by the FLSA, 29 U.S.C. § 216(b).

### AS AND FOR A SECOND CAUSE OF ACTION
**(Unlawful Failure to Pay Minimum Wage Compensation under the
Fair Labor Standards Act)**

134.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

135.    At all relevant times herein, Plaintiffs have been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. §§ 201, et seq.

136.    The FLSA regulates, among other things, the payment of minimum wage by employers whose employees are engaged in interstate commerce, or engaged in the production of goods for commerce, or employed in an enterprise engaged in commerce or in the production of goods for commerce, per 29 U.S.C. §206(a); 29 U.S.C. § 207(a)(1).

137.    The Defendants are subject to the minimum wage requirements of the FLSA because they acted as an enterprise engaged in interstate commerce and its employees are engaged in commerce.

138.    Defendants, pursuant to their policy and practice, violated the FLSA by refusing and failing to pay Plaintiffs and other similarly situated employees a lawful minimum wage for all hours worked.

139.    Section 13 of the FLSA, codified at 29 U.S.C. § 213, exempts certain categories of employees from minimum wage obligations.  None of the FLSA exemptions apply to Plaintiffs or other similarly situated employees.

140.     Plaintiffs and all similarly situated employees are victims of a uniform and employer-based compensation policy.  Upon information and belief, this uniform policy, in violation of the FLSA, has been applied, and continues to be applied, to all Field Service Technicians in Defendants Brooklyn and Bronx Facilities.

141.     Defendants have acted neither in good faith nor with reasonable grounds to believe that its actions and omissions were not a violation of the FLSA, and as a result thereof, Plaintiffs and other similarly situated employees, in addition to payment of back minimum wages, are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid minimum wages described pursuant to Section 16(b) of the FLSA, codified at 29 U.S.C. § 216(b).  Alternatively, should the Court find Defendants did not act willfully in failing to pay minimum wage, Plaintiffs and all similarly situated employees are entitled to an award of prejudgment interest at the applicable legal rate.

142.     Plaintiffs, on behalf of themselves and the Collective Class, seek recovery of their attorneys' fees and costs to be paid by Defendants, as provided by the FLSA, 29 U.S.C. § 216(b).

### AS AND FOR A THIRD CAUSE OF ACTION
**(Failure to Pay Lawful Overtime Premiums in Violation of NYCRR § 142.2.2 and Article 19 of the NYLL)**

143.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

144.     At all relevant times, Plaintiffs were employees and the Defendants have been employers within the meaning of the New York Labor Law.

145.     The overtime wage provisions of Article 19 of the New York Labor Law and its supporting regulations apply to Defendants.

146.    Defendants have failed to pay Plaintiffs and the Rule 23 Class the overtime wages to which they were entitled under the New York Labor Law.

147.    By Defendants' failure to pay Plaintiffs and the Rule 23 Class Members premium overtime wages for hours worked in excess of 40 hours per week, they have willfully violated the New York Labor Law Article 19, §§ 650 et seq., and the supporting New York State Department of Labor Regulations, including but not limited to the regulations in 12 N.Y.C.R.R. Part 142.

148.    Also, Defendants have violated NYCRR 142-2.2 and NYLL §§ 191 and 193 by failing to pay Plaintiffs and the Rule 23 Class at least one and one-half times the minimum wage for all hours worked over 40 in any workweek during the class period.

149.    Due to Defendants' violations of the New York Labor Law, Plaintiffs and the Rule 23 Class Members are entitled to recover from Defendants their unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Failure to Pay Lawful Minimum Wages and "Gap Time" Wages in Violation of NYLL §§ 191, 193 and 652 and Article 19)**

150.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

151.    At all relevant times, Plaintiffs were employees and the Defendants have been employers within the meaning of the New York Labor Law.

152.    The minimum wage provisions of Article 19 of the New York Labor Law and its supporting regulations apply to Defendants.

153.    Defendants have failed to pay Plaintiffs and the Rule 23 Class the minimum wages to which they were entitled under the New York Labor Law.

154.    By Defendants' failure to pay Plaintiffs and the Rule 23 Class Members minimum wages, they have willfully violated the New York Labor Law Article 19, §§ 652 et seq., and the supporting New York State Department of Labor Regulations.

155.    Due to Defendants' violations of the New York Labor Law, Plaintiffs and the Rule 23 Class Members are entitled to recover from Defendants their unpaid minimum wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

156.    Similarly, Defendants have failed to pay Plaintiffs and the Rule 23 Class the difference between the New York State minimum wage and their hourly rate of pay as determined by Defendants for all hours worked in a workweek, a practice that is unlawful under the New York Labor Law.

157.    Specifically, Defendants failure to pay these – known as "gap time" wages under the relevant precedent - is prohibited by Section 193 of the New York Labor Law which expressly prohibits an employer from making unauthorized deductions from employees' wages.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Failure to Furnish Accurate Wage Statements in Violation of NYLL §195(3))

158.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

159.    At all relevant times, Plaintiffs were employees and the Defendants have been employers within the meaning of the New York Labor Law.

160.    The recording keeping provisions of Article 19 of the New York Labor Law and its supporting regulations apply to Defendants.

161.    Defendants did not provide Plaintiffs and members of the Rule 23 Class with a legally sufficient wage statement upon the payment of wages, as required by NYLL § 195(3).

162.    NYLL §195(3) requires that employers furnish employees with wage statements containing accurate, specifically enumerated criteria required under the NYLL.

163.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class are entitled to an award of damages pursuant to NYLL § 198, in an amount to be determined at trial, pre- and post-judgment interest, costs and attorneys' fees, as provided by NYLL § 663.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, on behalf of themselves and all members of the putative class and collective actions, prays for relief as follows:

A.    That the Court determine that this action may proceed as a class action under Rule 23(b)(1) and (3) of the Federal Rules of Civil Procedure;

B.    That Defendants are found to have violated the provisions of the New York Labor Law as to Plaintiffs and the Class;

C.    That Defendants are found to have violated the Federal Fair Labor Standards Act as to Plaintiffs and the Collective Class;

D.    That Defendants' violations as described above are found to be willful;

E.    An award to Plaintiffs and the Collective Class and Class Members for the amount of unpaid wages owed, including interest thereon, and penalties, including liquidated damages, subject to proof at trial;

F.    That Defendants further be enjoined to cease and desist from unlawful activities in violation of the FLSA and NYLL;

G.     That Plaintiffs' counsel and Plaintiffs Thomas Lobbe, Edwin Vega, Anthony

Colon and Ruben Dejesus can adequately represent the interests of the class as

class counsel and class representative, respectively.

H.     An award of reasonable attorneys' fees and costs pursuant to the NYLL and 29

U.S.C. § 216 and/or other applicable law; and

I.     For such other and further relief, in law or equity, as this Court may deem

appropriate and just.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial

by jury as to all issues so triable.

DATED:  January 6, 2017

Christopher Q. Davis, Esq.
Rachel M. Haskell, Esq.
The Law Office of Christopher Q. Davis
225 Broadway Suite 1803
New York, New York 10007
646-430-7930 (main)
646-349-2504 (fax)

David Slarskey
Slarskey LLC
800 Third Avenue, 18th Floor
New York, NY 100012
212-658-0661 (phone)

*Counsel for Plaintiffs and the putative class*